Gentle **DANIELS** and Margaret Daniels, his wife, Plaintiffs,

v.

The **ATLANTIC REFINING COMPANY**, a foreign corporation, Defendant.

Civ. A. No. 2999.

United States District Court
D. Delaware.

Oct. 2, 1968.

Harvey Porter, Wilmington, Del., and Michael Shekmar, Philadelphia, Pa., for plaintiffs.

Rodney M. Layton and Martin I. Lubaroff, Richards, Layton & Finger, Wilmington, Del., for defendant.

## OPINION

STEEL, District Judge.

### Preliminary Statement

This is a civil action brought by plaintiff, Gentle Daniels, to recover damages from defendant, Atlantic Refining Company, for burns which he received on June 19, 1963, when Atlantic Solvent No. 52 (Stoddard Solvent) ignited while being sprayed upon carrots in an open field for the purpose of killing weeds. At the time of the accident plaintiff was employed by The Island Farms, Inc., at Milton, Delaware, which had purchased the solvent from the defendant, its manufacturer.[1] Plaintiff, Margaret Daniels, the wife of Gentle Daniels, is also claiming damages for loss of consortium.

Plaintiffs contend that the solvent, because of its inflammable characteristics, was known to defendant to be inherently dangerous to persons who used it as a weed killer, that defendant negligently failed to adequately warn plaintiff or defendant's vendee, plaintiff's[2] employer of the hazards incident to its use, and that defendant's negligence in this regard was the proximate cause of plaintiff's injury.

Defendant denies that it was negligent. It asserts that it gave Island Farms, Inc., adequate warning of all reasonably foreseeable product-related dangers, and that Island Farms, Inc., passed on the warnings to plaintiff. Defendant contends, in addition, that the accident was due to the contributory negligence of plaintiff, whom it claims caused the fire by lighting a match while assisting in spraying the solvent on the carrot field.

By stipulation the case was tried to the Court.

### Findings of Fact

1. The plaintiffs are citizens of Delaware. Defendant is a citizen of Pennsylvania and does not have its principal place of business in Delaware. The amount in controversy is in excess of $10,000, exclusive of interest and costs.

2. Daniels had first worked for The Island Farms, Inc., at Milton, Delaware, during the summer of 1962 as a farm laborer. He had returned to work for it in the same capacity in May, 1963, and was doing so on June 19, 1963, when he was injured.

3. Daniels' job required him to follow a sprayer consisting of a tank and boom which was attached to and pulled by a gasoline-powered tractor. At the time of the accident the sprayer was being used to spray a carrot field with a weed killer known as Stoddard Solvent which was manufactured and sold by defendant under the trade name of Atlantic Solvent No. 52. James Harris,

1. Actually, defendant sold the solvent to Draper Canning Company, an affiliate of Island Farms, Inc. The parties throughout the litigation have treated the two companies as identical.

2. When reference is made to "plaintiff" (singular) it means Gentle Daniels.

Daniels' son-in-law, was the driver of the tractor.

4. The tractor being used at the time of the accident had a vertical exhaust located approximately 15 to 20 feet from the sprayer boom on the hood. Both the tractor and sprayer had rubber tires. The sprayer had no independent power source, but the power needed to pump the solvent from the sprayer tank through the rubber pipes leading to the sprayer boom was obtained from a power take-off from the tractor.

5. When the sprayer was in operation the solvent was forced onto the ground through a series of nozzles on the boom, and a mist or fog was created along the entire width of the boom. This mist or fog reached the approximate height of an average man and had a depth of about 6 to 10 feet.

6. While the sprayer was operating, Daniels' principal duty was to walk behind and in close proximity to it in order to observe and keep all spray nozzles open and functioning properly. Usually he walked 15 to 20 feet behind the sprayer. In the event that a nozzle became clogged or inoperative, Daniels would signal the operator of the tractor to stop the tractor and sprayer. While the tractor and sprayer were stopped, Daniels would clean the nozzle by disengaging it and blowing into it with his mouth. After a nozzle was cleaned he would attach the nozzle, signal the driver to again start the sprayer, and momentarily stand close to the boom to make certain that the nozzle which he had cleaned was spraying. If it was he would signal the driver to put the tractor in gear and continue the spraying operation. In performing his job, Daniels' person and clothing became wet with the solvent.

7. On the morning of the accident, Daniels and Harris were spraying a carrot field. Harris estimated that each row of carrots was between a quarter of a mile and a mile long. The soil was typical of that found in Sussex County,

Delaware, and may be generally described as "sandy".

8. Between 5:00 p. m. on June 18 and 5:00 p. m. on June 19, 1963, the highest temperature recorded at Georgetown, five miles southwest of Milton, was 86 degrees Fahrenheit and the lowest temperature was 56 degrees Fahrenheit. It did not rain on June 19, 1963.

9. About 9:30 a. m., while the sprayer was being operated in the field, one of the nozzles became clogged. Daniels signaled Harris to stop the tractor and sprayer so that Daniels could clean the nozzle. After he had done so he signaled Harris to continue with the spraying.

10. According to Daniels, as the sprayer commenced functioning and he was about a foot or two away from the spray boom and was turning to walk farther to the rear of the spraying unit, the spray mist or fog created by the spraying ignited and he was enveloped in flames.

11. Harris testified that after Daniels had cleaned the nozzle and the tractor reached a point approximately one half way down a row, he suddenly felt heat hit him on the back of his head. He heard no noise. Harris turned around and saw that the spray boom was on fire. He then jumped off the tractor, which continued to move forward, and ran around the boom. He then saw Daniels whose clothing was on fire, about 25 or 30 feet or more behind the boom.

12. Reading the testimony of Daniels and Harris as it relates to the position of Daniels at the time when the accident occurred, the Court finds that the fire did not start while Daniels was a foot or two away from the sprayer and within a matter of seconds after the sprayer had begun to move after Daniels had cleaned the nozzle. It is more probable that Daniels had cleaned the nozzle, satisfied himself as to its operability and the tractor-sprayer had been in operation some minutes before the fire

started when Daniels was walking behind the sprayer.

13. After assisting Daniels in putting out the fire, Harris placed on Daniels the pajama pants which Harris was wearing. Harris then ran across the field which he had been spraying to the next field where the tractor had stopped. He turned the tractor off and returned to Daniels.

14. Daniels and Harris then proceeded to the road bordering the field and stopped a man in a pickup truck who took them to the Beebe Hospital where Daniels was admitted at approximately 9:50 a. m.

15. The only damage done by the fire to the tractor or sprayer was the burning off of the hoses on the spray boom.

16. As a result of the fire Daniels suffered serious injuries.

17. Atlantic Solvent No. 52 or "Stoddard Solvent" has a great number of agricultural and industrial uses. It is employed as a dry cleaning solvent, as a component in paints, as a controller of carrot weeds. It is manufactured to meet or exceed the minimum requirements of the standard specifications for Stoddard Solvent as set forth by the American Society for Testing Materials.

18. Atlantic Solvent No. 52 has a flash point of 104 degrees Fahrenheit by the Tag Closed Tester method. This means that at 104 degrees Fahrenheit the solvent will begin to vaporize to such an extent that a flash of flame will result if an ignition source consisting of a flaming splinter is applied to the vapor. The vapor can self-ignite without an ignition source if it is heated to between 500 and 900 degrees Fahrenheit.

19. The Interstate Commerce Commission does not classify Stoddard Solvent (Atlantic Solvent No. 52) as a "flammable" liquid for purposes of transportation in interstate commerce. A "flammable" liquid under its definition is one that vaporizes at 80 degrees Fahrenheit under the Tag Closed Tester method.

20. The defendant has produced Solvent No. 52 since 1934 and it has been used as a weed killer since 1948. Since 1953, 500,000,000 to 600,000,000 gallons of Stoddard Solvent produced by defendant and other manufacturers have been used in the United States. Various publications, Governmental and private, have recommended the use of it as a carrot weed killer. Robert L. Johnson, an engineer employed by defendant in its Products Development section, testified he had never heard of anyone who had been injured in using the solvent as a herbicide. Bounds, the farm manager of Island Farms, who was employed by it since the time when it first began to use Solvent No. 52 as a herbicide knew of no accidents that had resulted from use of the solvent. Alan J. Johnson, plaintiffs' expert, knew of no accident comparable to the instant one resulting from the use of Stoddard Solvent as a weed killer.

21. Since 1958, Atlantic has sold Atlantic Solvent No. 52 to Draper Canning Company, an affiliate of Daniels' employer, the Island Farms. The sales in 1958 were made by Laile W. Potter, an Atlantic salesman, to James Bounds, the supervisor of farm operations for Draper and for Island Farms. Bounds was Daniels' supervisor in 1962 and 1963.

22. In attempting to sell Atlantic Solvent No. 52 it was Potter's practice to leave with prospective customers a copy of Atlantic Customer Bulletin No. 5-2B-57 (Defendant's Exhibit No. 5) and a copy of a technical newsletter relating to the use of Atlantic Solvent No. 52 in controlling weeds. It is reasonable to infer that Potter left these materials at Draper Canning Company before the time of Daniels' accident. It also was the practice of Potter to give a verbal description of the purpose of the solvent to a prospective buyer.

23. All deliveries of the solvent were made by bulk carriers. In 1958, the solvent was pumped from the tank trucks into drums supplied by Draper. In 1959, Draper installed an underground tank

for the storage of the solvent and bulk shipments of the solvent were made to the tank. When needed, the solvent was conveyed from the tank by a farm truck to the sprayer.

24. In 1959, in discussing the need for installing an underground tank, Bounds and Charles Bonk of Draper questioned Elmer Lee, an Atlantic salesman, whether Draper should have an explosion-proof pump to pump the solvent out of the underground tank.

25. In 1959, Bounds witnessed the spilling of some Atlantic Solvent No. 52 from a drum while he was with Richard Burbage, an agricultural chemical salesman with a company other than defendant. Burbage told Bounds how flammable the substance was, that it had a flash point like lighter fluid or kerosene, and that the spillage should be burned off. Bounds and Burbage built an earth dike to contain the spillage and proceeded to set it on fire.

26. Bounds dealt with the solvent from 1958 until the date of Daniels' accident, and stated that he recognized the odor of the solvent as being similar to the odor of lighter fluid and/or kerosene. He was aware that the solvent was a petroleum product and that it was flammable.

27. From 1958 through 1963, Draper purchased large quantities of Atlantic Solvent No. 52. In some years, Draper purchased between 150,000 and 190,000 gallons. On some days two tank truck deliveries were made to Draper. The trucks delivering the solvent were clearly marked "Flammable" and were positioned so that anyone in the vicinity of the delivery point would have seen the trucks. Bounds saw these markings on the trucks and Daniels saw Atlantic trucks making deliveries to Draper.

28. At the time of each delivery from 1958 to 1963, a delivery ticket was presented to, and signed by, a Draper representative. Bounds signed many of these tickets, and a copy of the ticket was left with him. Each delivery ticket bore the following inscription:

"Caution—Read Carefully

Petroleum Naphtha and Solvents and their Vapors are Inflammable and their Vapors may be harmful if Inhaled."

29. Daniels stated that the solvent he used to kill the weeds smelled like kerosene, that he was warned that the solvent was flammable and not to smoke or light matches in the vicinity of its use.

30. Daniels was a smoker. Often while working, he had a partially smoked stub of a cigar in his mouth. Due to the fact that he was frequently seen with a cigar stub in his mouth, Daniels was often warned by both Bounds and Dix, another farm supervisor, about the flammable nature of the solvent. No one had ever seen Daniels smoke while the sprayer was in operation, but he did occasionally smoke after taking a short walk into the woods when the tractor was stopped at the end of a row.

31. Two theories as to the cause of the ignition of the Atlantic Solvent No. 52 were advanced. Plaintiffs assert the cause was a spark; defendant asserts the cause was an open flame. Plaintiffs' expert, Alan J. Johnson, testified that the flash fire was caused by a spark, resulting from either static electricity or friction of some kind such as that created by the power takeoff operation or a rock being thrown against the metallic body of the sprayer. Johnson testified that while static electricity was a possible cause, a spark having a frictional source was the probable cause. Both Johnson and George Prussing, defendant's expert, recognized that an open flame such as a lighted match could ignite the solvent. Johnson eliminated this possibility from his consideration because the questions propounded to him by plaintiffs were based upon the hypothesis that no match had been lighted in the vicinity of the solvent. Prussing, on the other hand, stated without qualification that under the circumstances existing when the accident occurred the only way in which the solvent could have

been ignited was by an open flame. It was his view that the fire was probably started by Daniels striking a match. In his opinion, it was not possible for static electricity, and unlikely for a frictional spark, to have ignited the solvent, Nor, in his opinion, was the solvent ignited by the glowing end of a cigar or cigarette. Johnson also predicated his opinion on the premise that the fire started just as Daniels was turning to walk away from the boom, a doubtful assumption. (See F.F. 12).

32. Giving due consideration to all relevant evidence relating to the cause of the fire, the theory espoused by plaintiffs is no more plausible than that advanced by defendant. The most that can be said from plaintiffs' standpoint is that the evidence as to causation is in equipoise.

33. Even if the spray was in fact ignited by static electricity or a frictional spark, defendant did not know or have any reason to know that this might occur when the spray was used as a herbicide.

34. The warnings which defendant gave to Island Farms, Inc., concerning the use of Solvent No. 52 as a carrot weed killer were adequate in the light of the foreseeability of the hazards incident to its use.

### Conclusions of Law

1. This Court has jurisdiction over the controversy under 28 U.S.C. § 1332 (a) (1).

2. The law of Delaware governs all substantive issues.

3. Plaintiffs have the burden of proving by a preponderance of the evidence that defendant was negligent and that its negligence was the proximate cause of plaintiffs' injuries.

4. Restatement, Second, Torts § 388 states the principles applicable to the duty to warn which the law imposes upon a manufacturer-vendor of a dangerous product. A Delaware court, it is believed, would follow these principles.[3]

5. Defendant was not negligent in failing to give an adequate warning concerning the dangers incident to using Atlantic Solvent No. 52.

6. If the proof establishes with equal likelihood that an injury could have been proximately caused in either of two ways, for one of which a defendant may be responsible and for the other of which a defendant would not be responsible, the burden of proof which a plaintiff must carry to establish that the injury was proximately caused by the defendant has not been sustained. McGuire v. McCollum, 10 Terry 359, 116 A.2d 897 (Del.Super.Ct.1955); see Hopkins v. E. I. Du Pont De Nemours & Co., 212 F.2d 623, 626 (3d Cir. 1954) (discussing Pennsylvania law); Prosser on Torts 245 (3d ed. 1964).

7. Even if defendant were negligent under the standards of § 388 in failing adequately to warn of the dangers incident to the use of Atlantic Solvent No. 52, plaintiff cannot recover. In view of Finding of Fact 32 plaintiffs have failed to carry the burden of proving by a preponderance of evidence that the accident was proximately caused by the failure of defendant to warn.

8. The complaint will be dismissed.

---

3. Restatement, Second, Torts § 388 states: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel, in the manner for which and by a person for whose use it is supplied, if the supplier

    (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
    (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
    (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."